**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RONALD COLLINS,

    Plaintiff

v.

ROMEO ARANAS, et. al.,

    Defendants

Case No.: 3:17-cv-00417-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 23

     This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Plaintiff's Motion for Preliminary Mandatory Injunction. (ECF Nos. 23, 23-1, 23-2.) Defendants filed a response. (ECF Nos. 26, 26-1, 28-1 to 28-3.) Plaintiff filed a reply. (ECF No. 31.)

     After a thorough review, it is recommended that Plaintiff's motion be granted.

**I. BACKGROUND**

     Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Second Amended Complaint (SAC) ECF No. 15.) The allegations concerns events that took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC), Warm Springs Correctional Center (WSCC), and High Desert State Prison (HDSP). (*Id.*) Defendants are: Romeo Aranas, Isidro Baca, Brian Borg, Gary Dutton, Michelle Hicks-Moses, Marsha Johns, John Keast (erroneously identified by Plaintiff as Kirst), Dillyn Keith, David Mar (as a physician and member of the Utilization

Review Committee)[1], Melissa Mitchell, Martin Naughton, Joseph Walls, Gene Yup, Jane Doe Dental Assistant and Doe members of the Utilization Review Committee.[2]

The court notes that the screening order discussed the fact that while Plaintiff did not name Warden Baca (or Borg, Mitchell, and Moses) in the caption (ECF No. 16 at 3, 18 n. 5), he did include Baca's name in the SAC (ECF No. 15 at 16). The screening order, however, did not allow Plaintiff to proceed on any claims against Baca. (*See* ECF No. 16.) Therefore, Baca is *not* a party to this action. While Borg, Mitchell and Moses were also not named in the caption, the screening order concluded that Plaintiff did in fact state colorable claims against them.

On screening, Plaintiff was allowed to proceed with a claim in Count I that defendants Borg, Jane Doe dental assistant, Aranas, Keith, Moses and Yup were deliberately indifferent to a serious medical need in violation of the Eighth Amendment when they knew of Plaintiff's pain and need for dental treatment, but refused to take action to provide Plaintiff with necessary dental care. (ECF No. 16 at 7-8.)

In Count II, Plaintiff was allowed to proceed with: (1) an Eighth Amendment excessive force claim against defendant Dutton based on allegations that Dutton unnecessarily and intentionally pulled on Plaintiff's collar and made him fall to the ground, causing injury; (2) a retaliation claim against Dutton based on allegations that Dutton pulled on Plaintiff and caused him to fall because Plaintiff had stated he was going to file a grievance against Dutton; and (3) a retaliation claim against Mitchell, Mar, Johns, Naughton, Walls, Keast, and Aranas, based on allegations that Plaintiff informed an officer that Dutton had deliberately pulled him from a van,

---

[1] The court ordered the substitution of Dr. Mar as one of the John Doe Utilization Review Committee members at a June 12, 2019 hearing.

[2] Plaintiff was allowed to proceed against these defendants when Plaintiff learns their names.

1  and Nurse Melissa Mitchell told him he would not be treated for his medical conditions, and

2  Mar, Johns, Naughton, Walls and Aranas ignored his medical needs.

3        In Count III, Plaintiff was permitted to proceed with a deliberate indifference to serious

4  medical needs claim in violation of the Eighth Amendment against Mar (as a physician, and

5  member of the Utilization Review Committee)[3], Johns, Naughton, Walls, Keast, Aranas and Doe

6  members of the Utilization Review Committee, related to serious medical conditions concerning

7  his foot, shoulder, chest and back and associated pain, and the failure to provide necessary care.

8  Plaintiff was also allowed to proceed with a retaliation claim against Keast, Mar, Johns,

9  Naughton and Walls, Naughton and Mitchell.

10        The court will now provide the specific details of the claims in Count III:

11        Plaintiff alleges that he injured his left shoulder and arm when he was pulled out of the

12  prison medical transportation van by Dutton on December 6, 2016. He informed Mar, Johns,

13  Naughton and Walls for over 15 months of his left shoulder, arm, and chest pain; however, they

14  did not test him or treat him and told him nothing was wrong with him. He requested an MRI for

15  over 14 months, but they always refused. Johns, Naughton and Mar told Plaintiff for over a year

16  that he would see Dr. Long to be treated for his arm and shoulder. Keast refused to schedule

17  Plaintiff because of prior litigation towards Defendants, and told Plaintiff they would not do

18  anything for him.

19        In addition, Plaintiff alleges problems with his right foot and that he requires a brace to

20  walk. He gets blisters on his foot and his ankle and toes swell to twice their normal size. He

21

22

23

---

[3] The request to amend to add Dr. Mar as a John Doe member of the Utilization Review
Committee was granted at a hearing on June 12, 2019.

showed this condition to Keast, Naughton, Johns and Mar, but they refused to diagnose or treat him or have him seen by a specialist. He is in pain all the time and has to use a walker.

When he complained about his shoulder and foot conditions, Defendants cancelled his pain medication for his back, foot and nerve problems.

On November 22, 2017, Walls knew Plaintiff was in pain in his foot but refused to look at Plaintiff's foot to properly diagnose it and refused to discuss treatment for the foot pain. On October 23, 2017, Naughton admitted to Plaintiff that x-rays showed a problem with the right foot, but he refused to do anything about it. After several failed attempts to have his foot diagnosed and treated, Plaintiff told Walls he intended to sue Walls for failure to treat his foot. In retaliation, Plaintiff alleges that Walls had nurse Melissa Mitchell write Plaintiff up on disciplinary charges for giving false information. He was found not guilty.

On September 18, 2017, Plaintiff saw Walls about his left arm and shoulder, but Walls did not do any tests. Walls said he would request an MRI of the shoulder. On October 2, 2017, Plaintiff sent a kite asking what treatment Walls had requested for the shoulder, and was told Walls had ordered an MRI. More than a month went by without an MRI, and Plaintiff sent another kite. He was told the Utilization Review Committee did not approve the MRI. Plaintiff alleges that based on what nurses told him, Walls did not really request an MRI, and the committee actually denied Plaintiff's own request.

Plaintiff avers that the reason Defendants refused to diagnose his shoulder was to save costs and make it impossible to prove that he was injured as a result of Dutton pulling him out of the van. They refuse to have him seen by a foot specialist. He alleges that Aranas is aware of these problems and the doctors' refusal to treat him by virtue of his responses to Plaintiff's grievances, and he refuses to order the problems be addressed.

4

For over two weeks, Plaintiff filed emergency grievances and called medical "man-downs" due to excruciating pain in the shoulder and from a bone popping out of his chest, but Defendants ignored his pleas for help. Naughton denied a nurse's request to send Plaintiff to the hospital. The pain became so bad that Plaintiff got extremely intoxicated on February 16, 2018, and made statements that led to him being transferred to the mental health unit. On March 23, 2018, he was transferred to HDSP, he says because they were tired of listening to his pleas for help and because of his pending litigation.

On April 11, 2018, he was taken to the HDSP medical department and x-rays of his shoulder were taken. He then saw a neurologist, Dr. Wolff, who told Plaintiff his rotator cuff was torn, and he would need to be treated with cortisone injections. He also told Plaintiff a CT scan of the shoulder would be required. In addition, he advised Plaintiff he had a separated breast plate, and he recommended that Plaintiff see a surgeon/specialist. He put in a referral on April 11, 2018 and June 6, 2018. Plaintiff was transferred back to NNCC.

On July 12, 2018, Plaintiff saw Dr. Naughton for pain in the arm and shoulder, and Dr. Naughton told Plaintiff Dr. Wolff never recommended Plaintiff see a surgeon and told Plaintiff he would send him back and forth across the state until Plaintiff signed a refusal to be seen for his arm and shoulder. He also alleges that Dr. Naughton took his walker in retaliation for his complaining of pain.

Plaintiff filed a motion for preliminary mandatory injunction. (ECF No. 23.) The motion for a preliminary injunction relates only to that component of Count III concerning the left arm and the bone sticking out of his chest. Specifically, he reiterates that when he was eventually permitted to see Dr. Wolff , it was recommended that he be referred to Dr. Kam, a general surgeon, for possible "SC" (sternoclavicular) joint reconstruction and for sternal lipoma

evaluation, but the Utilization Review Committee denied his request, saying they would continue to monitor the condition. He states that Dr. Naughton subsequently told him no treatment would be recommended. He asks for an order from this court that he see Dr. Kam, as recommended by Dr. Wolff.

## II. LEGAL STANDARD

The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Injunctions and restraining orders are governed procedurally by Federal Rule of Civil Procedure 65, but case law outlines the substantive requirements a party must satisfy to obtain an injunction or restraining order. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) ("[T]he general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction.").

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (internal quotation marks and citation omitted). The instant motion requires that the court determine whether Plaintiff has established the following: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20 (citations omitted). ). The Ninth Circuit has held that "serious questions going to

the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an

injunction, assuming the other two elements of the *Winter* test are met." *Alliance for the Wild*

*Rockies v. Cottress*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

The Prison Litigation Reform Act (PLRA) mandates that prisoner litigants must satisfy

additional requirements when seeking preliminary injunctive relief against prison officials.  The

PLRA provides, in relevant part:

> Preliminary injunctive relief must be narrowly drawn, extend no
> further than necessary to correct the harm the court finds requires
> preliminary relief, and be the least intrusive means necessary to
> correct that harm. The court shall give substantial weight to any
> adverse impact on public safety or the operation of a criminal
> justice system caused by the preliminary relief and shall respect the
> principles of comity set out in paragraph (1)(B) in tailoring any
> preliminary relief.

18 U.S.C. § 3626(a)(2). Thus, § 3626(a)(2) limits the court's power to grant preliminary injunctive

relief to inmates. *See Gilmore v.  People of the State of California*, 220 F.3d 987, 998 (9th Cir.

2000). "Section 3626(a)...operates simultaneously to restrict the equity jurisdiction of federal

courts and to protect the bargaining power of prison administrators-no longer may courts grant or

approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at

999.

### III. DISCUSSION

**A. Likelihood of Success on the Merits**

Plaintiff argues that he is likely to succeed on his claim that Defendants were deliberately

indifferent to his serious medical need—his left arm and the bone sticking out of his chest—

because they refuse to refer him to the specialist, Dr. Kam, as was recommended by

Dr. Wolff and he continues to be in pain.

Even though Plaintiff's motion is limited to this specific claim, Defendants argue that Plaintiff does not show a likelihood of success on the merits as to *any* of his claims. Whether Plaintiff is likely to succeed on his excessive force, retaliation claims and Eighth Amendment claims concerning his dental care and treatment of his foot has nothing to do with whether he is likely to succeed on the merits of his Eighth Amendment claim focused on his left arm and the bone he claims is popping out of his chest. In fact, Defendants do not address the merits of his claim concerning the sternoclavicular joint at all. There is no discussion of Plaintiff's assertion that Dr. Wolff recommended an evaluation by a general surgeon related to this condition, which was denied or deferred by the Utilization Review Committee, or Plaintiff's assertion that he continues to suffer in pain related to this condition. Instead, they focus on Plaintiff's claim that his left shoulder was injured after he fell out of the van and discuss his treatment from *September 2017 to March 12, 2018*, when Plaintiff's motion specifically refers to a recommendation made by Dr. Wolff in *April and June of 2018*. Similarly, the submission of some of Plaintiff's dental records and records related to his foot condition have no bearing on whether Defendants were deliberately indifferent to the left arm and bone popping out of Plaintiff's chest.

In the future, defense counsel should focus on the particular claim at issue and address the arguments made in support of a motion for preliminary injunction.

### 1. Eighth Amendment Deliberate Indifference to Serious Medical Need

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992),

1   *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also*

2   *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091,

3   1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition

4   could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

5   *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

6          If the medical need is "serious," the plaintiff must show that the defendant acted with

7   deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

8   omitted). Deliberate indifference is only present when a prison official "knows of and disregards

9   an excessive risk to inmate health or safety; the official must both be aware of the facts from

10  which the inference could be drawn that a substantial risk of serious harm exists, and he must

11  also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698

12  F.3d at 1213 (citation omitted).

13         "A difference of opinion between a physician and the prisoner—or between medical

14  professionals—concerning what medical care is appropriate does not amount to deliberate

15  indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at

16  1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Instead, to

17  establish deliberate indifference in the context of a difference of opinion between a physician and

18  the prisoner or between medical providers, the prisoner "'must show that the course of treatment

19  the doctors chose was medically unacceptable under the circumstances' and that the defendants

20  'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681

21  F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

22

23

**2. Analysis**

Plaintiff sent a kite on March 14, 2017, stating that he fell out of a transport van on December 6, 2016, and hurt his arm and shoulder, and Dr. Naughton told him on March 13, 2017 that he would be scheduled to Dr. Long. (ECF No. 23-1 at 18.) He sent another kite on June 15, 2017, three months later, asking if he would be seen about his left arm/shoulder, and he was told again that he was scheduled to see Dr. Long. (ECF No. 23-1 at 19.) He sent his next kite, three months after that, stating that Dr. Walls said he had a tear, and he asked what the plan was for treatment as he had been in pain for nine months. The response told him that he was able to review his chart on March 29, 2017, and could review it again in March of 2018, but did not address his complaints of pain or request for a treatment plan. (ECF No. 23-1 at 46.) He sent another kite on October 2, 2017, stating that he saw Dr. Walls on September 12, 2017, and asked whether an MRI of the left shoulder was ordered. (ECF No. 23-1 at 24.) He asked whether the MRI was scheduled again on November 24, 2017. In response, he was told that the Utilization Review Committee did not approve the MRI. (ECF No. 23-1 at 15.)

On December 2, 2017, he filed grievance 20063058376, stating that he had been complaining of pain in his shoulder for a year, and saw Dr. Walls who believed an MRI was necessary to determine whether the tear could be repaired. He then received a response to a kite that the Utilization Review Committee denied the MRI, and in addition his Methadone pain medication was cancelled. (ECF No. 23-2 at 8-10.) C. Lucas responded that the Utilization Review Committee reviewed the request for an MRI and decided to defer and continue to monitor. (ECF No. 23-2 at 7.) He sent a first level grievance stating that he was sending kites every week about his shoulder pain. He was told in response by D. Richard, that he was seen and assessed by an NDOC provider on January 22, 2018 and January 31, 2018, and had an x-ray on

January 31, 2018, that was negative, so an MRI was not indicated. He was also told he was receiving Indocin to manage his pain. (ECF No. 23-2 at 5.) Plaintiff submitted a second level grievance, requesting an MRI, and stated that he was given Indocin as an anti-inflammatory for his back condition, and it was not a pain medication. He also reported at this time a bone sticking out of his neck. (ECF No. 23-2 at 4.) Dr. Aranas responded at the second level grievance, stating that Plaintiff had been properly evaluated for his condition. (ECF No. 23-2 at 3.)

Plaintiff sent another kite on December 27, 2017, asking whether an MRI showed a problem with his neck, and that his shoulder was hurting. (ECF No. 23-1 at 28.) He sent another kite on January 2, 2018, stating that due to the pain he could not sleep or lie down. (ECF No. 23-1 at 29.) He kited again on January 6, 2018, asking to be seen about his torn shoulder and the bone sticking out of his chest. (ECF No. 23-1 at 32.)

He filed an informal grievance (20063060445) on January 23, 2018. He indicated in that grievance that an MRI was in fact performed, but no one would allow him to review it or discuss the results with him. (ECF No. 23-1 at 12-13.) C. Lucas responded that Plaintiff had an appointment on February 12, 2018, where the MRI results were discussed. (ECF No. 23-1 at 11.) In his first level grievance, Plaintiff stated that this was a lie. (ECF No. 23-1 at 10.) D. Richard responded at the first level and told Plaintiff to submit a kite to discuss the MRI results again. (ECF No. 23-1 at 9.) In his second level grievance, Plaintiff stated that there was a refusal to go over the MRI results. (ECF No. 23-1 at 8.) The second level response told Plaintiff to kite if he wanted to review the results, and that he signed a refusal of his pending orthopedic consultation on August 1, 2018. (ECF No. 23-1 at 7.)

In the interim, Plaintiff sent a kite on January 28, 2018, asking for an update on his left shoulder that was hurting, and indicated his pain medications were cancelled. (ECF No. 23-1 at

30.) He sent another kite on January 31, 2018, stating that he was in unbearable pain and could not lay down or sleep. (ECF No. 23-1 at 31.)

On February 16, 2018, he called a "man-down" for the chest pain at the clavicle. He was noted as being inebriated, and was threatening to hang himself to end his pain. (ECF No. 23 at 18.) This is reiterated in a medical report of the same date, as well as a notice of charges. (*Id.* at 14, 17.)

On March 5, 2018, Plaintiff submitted an emergency grievance concerning the bone poking out of his chest and the tear in his left shoulder, which were causing him excruciating pain. (ECF No. 23 at 34.) In response, he was advised it was not an emergency and that he had x-rays that were normal; had been seen by providers; and was given anti-inflammatories for comfort. (ECF No. 23 at 24.) It appears he was also seen by Dr. Naughton that day, and he reported that a couple of weeks prior something popped near his collar bone and he was in constant pain in the shoulder and neck, and his left arm was numb and tingling near the arm pit. He was evaluated and it was noted that it appeared that the bone was popping out of the left side. The notes state that Dr. Naughton would research whether Plaintiff could go down south for a consult. (ECF No. 23 at 20.)

On March 6, 2018, there is a note that Plaintiff requested an MRI of the left shoulder, but that was not recommended by Dr. Walls. Plaintiff was complaining of severe pain in the left shoulder and clavicle. He was authorized to be sent to HDSP for evaluation. (ECF No. 23 at 27.)

He sent a kite on March 26, 2018, asking to be seen about his arm and shoulder. (ECF No. 23-1 at 40.) He sent another kite on April 7, 2018, indicating he had been transferred from NNCC to HDSP to have his collar bone looked at and he was in unbearable pain. (ECF No. 23-1 at 38.) He was advised that he was on the provider's list. (ECF No. 23-1 at 51.)

He saw Dr. Wolff on April 11, 2018. He reported that he fell out of a van 16 months prior and injured his left shoulder. He complained of severe pain in the shoulder region, and then woke up and noted pain in the "left SC joint." The impressions were: anterior dislocation/subaxial left sternoclavicular joint. An injection was recommended as well as a CT scan. Dr. Wolff also recommended that Plaintiff be referred to Dr. Kam after the CT scan was completed for evaluation of SC joint reconstruction. (ECF No. 23 at 32.)

A CT scan was performed on May 10, 2018, which revealed: moderate sternoclavicular joint space narrowing consistent with degenerative change or osteitis, and a subcutaneous lipoma anterior to the superior sternum. (ECF No. 28-2 at 3.)

On May 25, 2018, Plaintiff sent a kite asking whether he had been scheduled to see the shoulder specialist Dr. Wolff recommended regarding his left arm and the bone in his chest. He also made a note about medications. In response, he was told his medications were filled. (ECF No. 23-1 at 45.) He sent another kite on May 29, 2018, to see if he was scheduled to see the shoulder specialist Dr. Wolff recommended. Plaintiff was advised the next day that he was scheduled to see the provider to discuss the results of the CT scan, and that he was not approved for referral to the shoulder specialist due to the CT scan results. (ECF No. 23-1 at 4.) He sent a similar kite on May 30, 2018, stating his chest and shoulder were hurting, and asked if he would see the shoulder specialist. He was told that the referral was deferred due to the CT scan results, and he would be scheduled with the provider to discuss the results. (ECF No. 23-1 at 5.)

An x-ray of the left shoulder was taken on June 6, 2018, which was unremarkable showing no fracture or dislocation. (ECF No. 28-2 at 2.)

Plaintiff was seen on June 6, 2018, for a follow up regarding the CT scan of the SC joints. For the degenerative narrowing, a cortisone injection was recommended. The SC joint

1   remained protruding and was tender. Dr. Wolff again stated that Plaintiff should be referred to

2   Dr. Kam for evaluation and possible intervention for the sternal lipoma. (ECF No. 23 at 33, 24.)

3   The Utilization Review Committee deferred this referral on June 12, 2018, and said Plaintiff's

4   condition would continue to be monitored. (ECF No. 23 at 34, 35.)

5          On June 7, 2018, Plaintiff sent a kite asking what treatment or tests would be done

6   regarding his left shoulder. He was told he was placed on sick call. (ECF No. 23-1 at 43.) On

7   June 8, 2018, he sent a kite asking why his left shoulder was not being addressed. He received a

8   response dated June 12, 2018, which stated that he was given a steroid injection and was offered

9   a repeat injection, but he refused. (ECF No. 23-1 at 42.) He sent another kite on June 9, 2018,

10  stating that his left shoulder hurt, and he was told he was placed on sick call. (ECF No. 23-1 at

11  44.)

12         He sent his next kites on June 20 and 23, 2018, stating that his shoulder and the bone

13  popping out from his chest hurt. (ECF No. 23-1 at 35, 37.)

14         He sent another kite on September 24, 2018, stating that his left arm, chest and neck were

15  hurting. His neck was popping and it was harm to move his neck and arm. In response he was

16  told he had already been seen for this condition. (ECF No. 23-1 at 21.) On October 3, 2018, he

17  sent another kite asking when he would be seen for the pain in his arm and chest and neck. (ECF

18  No. 23-1 at 48.) On October 13, 2018, he sent a kite stating that his left arm was completely

19  numb and complained about the bone popping out of his chest. (ECF No. 23-1 at 49.)  On

20  October 14, 2018, he asked for a classification meeting to discuss the refusal to treat his arm and

21  shoulder and the bone popping out of his chest. (ECF No. 23-1 at 50.) He reported that his left

22  arm was numb and hurting on October 21, 25, 26, and 29 2018. (ECF No. 23-1 at 33, 34, 39, 41.)

23  He complained his left arm was burning on November 6, 2018. (ECF No. 23-1 at 25.)

In sum, the court finds that Plaintiff has submitted evidence to support a claim of deliberate indifference regarding the left shoulder and the bone popping out of his chest. Plaintiff saw Dr. Wolff on April 11, 2018, for complaints of pain in the left shoulder and the sternoclavicular joint, and Dr. Wolff recommended a CT scan and then referral to Dr. Kam for evaluation for sternoclavicular joint reconstruction after the results of the CT were obtained. The CT on May 10, 2018 revealed degenerative changes *and* a subcutaneous lipoma anterior to the superior sternum. Plaintiff kited to see the specialist as recommended by Dr. Wolff on May 25 and 29, but was told that the referral was deferred due to the CT scan results. When he saw Dr. Wolff again on June 6, 2018, he had an injection for the degenerative narrowing, but Dr. Wolff still recommended Plaintiff be referred to Dr. Kam for evaluation and possible surgical intervention for the sternal lipoma. Nevertheless, on June 12, 2018, the committee deferred, and said they would monitor Plaintiff.

While this might be described as a difference of opinion between Defendants, Plaintiff presents evidence that he continued to kite and complain of pain and numbness with respect to the left shoulder and clavicle in June 2018, and then in September, October and November of 2018. The court notes that in his reply brief, Plaintiff reiterates that his motion seeks an order that Defendants comply with Dr. Wolff's recommendation for Plaintiff to see Dr. Kam. He states that the bone popping out of his chest moves and causes him a great deal of pain, as well as shock waves down his arm. Therefore, there is evidence that there was a conscious disregard of his complaints of pain.

The court is not making a final determination on the merits of this claim, but at this juncture Plaintiff has provided evidence that Defendants have ignored his complaints of pain

1  relative to the sternoclavicular joint and Defendants have not provided any evidence to the

2  contrary.

3          The court notes, however, that Defendants state that Plaintiff has no problems with his

4  left shoulder, and submit a report from June 6, 2018, stating that Plaintiff had an unremarkable

5  left shoulder x-ray. (ECF No. 28-2.) That does not necessarily defeat a claim of deliberate

6  indifference because Plaintiff continues to complain of pain in the shoulder, states that his pain

7  needs have not been met. In addition, typically an x-ray would not show a soft tissue injury, and

8  Plaintiff intimates that a medical provider previously suggested he had a rotator cuff tear.

9  **b. Likelihood of Irreparable Injury**

10          Despite Defendants claims that Plaintiff's motion "contains no evidence or exhibits which

11  substantiate his claims," (ECF No. 26 at 6:6-7) Plaintiff has in fact submitted evidence that he

12  was referred to a specialist by Dr. Wolff for evaluation, but the Utilization Review Committee

13  deferred this referral in light of the CT results. The problem is that Dr. Wolff still recommended

14  referral to Dr. Kam *after* he had reviewed the very the CT results that the Utilization Review

15  Committee relied on in deferring the referral. When coupled with the fact that Plaintiff continued

16  to kite for months complaining that he was in pain, to no avail, Plaintiff has persuaded the court

17  that he will be irreparably harmed absent injunctive relief.

18  **c. Balance of Equities and Public Interest**

19          Defendants argue that an injunction should not issue because there is no evidence

20  Plaintiff is in any danger, and he is being monitored and given ongoing medical care.

21          The court disagrees, and finds that the balance of equities tips in Plaintiff's favor, and this

22  limited injunction would be in the public interest. Plaintiff has continued to complain of pain

23  with respect to the bone popping out of his chest and of pain and numbness in the left

arm/shoulder, and his complaints have seemingly not been addressed to this point. Defendants state that they have given proof Plaintiff is receiving ongoing medical care but they did not actually provide any evidence that Plaintiff is receiving ongoing care to address these complaints. In fact, they don't even discuss Dr. Wolff's referral recommendation, the Utilization Review Committee's decision to defer the referral to Dr. Kam, or his continuing complaints of pain.  In the absence of any evidence supporting their position, the balance of equities tips in Plaintiff's favor and it is in the public interest to require a referral to Dr. Kam, consistent with Dr. Wolff's recommendation.

Finally, the court will address Defendants' statement that the court "in its wisdom" already denied a previously filed motion for preliminary injunction. (ECF No. 26 at 7:19-20.) The court appreciates the compliment, but notes that the previously filed motion for preliminary injunction was *denied without prejudice* on screening. That motion was requesting an MRI, and at that time the court did not have the benefit of all of Plaintiff's records or the recommendation of Dr. Wolff that Plaintiff should be evaluated by Dr. Kam.

**D. Scope**

The court is mindful of the PLRA's requirement that injunctive relief in inmate cases must be narrowly drawn and extend no further than necessary to correct the harm identified by the court, and is the least intrusive means to correct that harm. The relief Plaintiff seeks—an order that he be seen by Dr. Kam as recommended by Dr. Wolff—is sufficiently narrow to comply with the PLRA's mandate.

Therefore, the court recommends a preliminary injunction be entered that orders Defendants to have Plaintiff seen by Dr. Kam for evaluation of the left arm/shoulder and sternoclavicular lipoma, consistent with Dr. Wolff's recommendations in April and June of 2018.

This evaluation should take place within 30 days of any order adopting this Report and Recommendation.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Plaintiff's motion for preliminary injunction (ECF No. 23), and ordering Defendants to have Plaintiff evaluated by Dr. Kam regarding the left arm/shoulder and sternoclavicular lipoma, consistent with Dr. Wolff's recommendations in April and June of 2018, within 30 days of any order adopting this Report and Recommendation.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: June 13, 2019.

_William G. Cobb_
William G. Cobb
United States Magistrate Judge